Picker Corporation et al. *v.* United States

Entered at Cleveland, Ohio
Entry Nos. 110115, etc.

First Division, Appellate Term

(Decided September 9, 1975)

*Arter & Hadden* (*Robert E. Glaser* of counsel) for the appellants.
*Rex E. Lee*, Assistant Attorney General (*James Caffentzis*, trial attorney), for the appellee.

Before Watson, Maletz, and Richardson, Judges

Richardson, Judge: This is an application filed by the importer for a review of the decision and judgment of Landis, J., sitting

171

in reappraisement, 68 Cust. Ct. 276, R.D. 11768 (1972), and deciding after trial that constructed value,[1] as appraised, is the proper value of X-ray equipment and parts exported from Denmark between 1968 and 1970. The importer contended before the trial court and contends here that export value [2] is the proper basis for determining the value of this merchandise.

The record in the case consists of testimony of two witnesses in the employ of the appellant-importer, an affidavit and supplemental affidavit of two employees of the manufacturer-exporter, and other documentary exhibits, all but two of which were received in evidence on behalf of the appellant. It appears from the evidence that the manufacturer, Picker-Andrex X-Ray A/S, a subsidiary of appellant Picker Corporation, sold its x-ray equipment and parts throughout the world through distributors and wholesalers in various countries at prices set forth in price lists attached to the affidavit of its production manager, Bent Nielsen, and its controller, Eyvind Laursen (exhibit 1). As to conditions of such sales, exhibit 1 states:

10. That the prices set forth in all such price lists are the prices charged for the respective models, accessories, supplies and parts when sold in any quantity to distributors of ANDREX covered by such price lists and that ANDREX does not give quantity discounts.

11. That the respective models, accessories, supplies and parts set forth in all the exhibits hereto are identical physical characteristics.

12. That the prices set forth in all price lists attached hereto include all expenses incidental to placing the X-ray equipment, accessories, supplies and parts in condition, packed already for export shipment.

13. That all of sales of ANDREX during 1968, 1969 and 1970 have been made in the usual and ordinary conduct of its business.

14. That the prices set forth on all the attached pricelists are prices which are available to all distributors in the areas covered by such pricelists and that such pricelists are freely circulated to distributors of ANDREX in such areas, which distributors determine the sales price to customers in their individual countries after import has taken place in such countries.

15. That ANDREX imposes no restrictions upon the ultimate use or disposition of X-ray equipment, accessories, supplies or parts sold by it, except for those restrictions imposed upon ANDREX by the Act of the United States of America.

[1] 19 U.S.C.A. § 1401a(d).
[2] 19 U.S.C.A. § 1401a(b).

16. That the trade conditions, practices and procedures under which ANDREX markets its products are the same as those confronting other manufacturers of similar merchandise.

It further appears from the record that William G. Langston, secretary and general counsel for appellant Picker Corporation, examined shipping documents and invoices in the manufacturer's offices in Denmark to verify the accuracy of the prices set forth in the price lists attached to exhibit 1, and was convinced of their accuracy. It was brought out through this witness that Picker-Andrex was the transfer-of-assets vehicle established by appellant Picker Corporation following its acquisition of the assets of the estate of Holger Andreasen, deceased, with whom appellant had previously done business in the importation of X-ray equipment into the United States as a distributer.

Walter L. Seibyl, marketing manager for Picker Industrial U.S., a separate operating division of appellant, testified concerning Picker-Andrex' sales practices, among other things. He stated that Andrex' prices are determined in Copenhagen by its marketing manager and general manager and they treat his company as they would any other wholesaler around the world, that Picker-Andrex markets its X-ray equipment everywhere through an international marketing organization except in the United States and Canada, and that he is responsible for marketing the products in the United States and also acts as liaison with the Canadian group, and that Picker-Andrex also sells to wholesalers in other countries of the world, some of whom are related companies.

The record also contains letters written or sent by Seibyl to the U.S. Customs Service. One letter (exhibit A) dated July 14, 1969, states:

> As per your request, please find enclosed descriptive literature on the Picker-Andrex portable X-ray equipment requested by your office on June 20, 1969.
>
> Answers to the questions you raised are as follows: Picker U.S. receives a special intra-company price from Picker-Andrex. Picker-Andrex does not sell this equipment to unrelated purchasers in the United States but only sells through the Picker Industrial domestic organization. Clarification is required on the question of what "assists" [3] Picker domestic supplies to Picker-Andrex.

---

[3] Although the entries covering the X-ray equipment indicate that all but two of the imported units were equipped with American-made X-ray tubes as to which item 807.00, TSUS, treatment was sought, Mr. Seibyl testified that Picker U.S. did not supply any materials for these units.

And the other letter (exhibit B) dated October 27, 1969, states:

Enclosed is the price list which you requested from Picker-Andrex X-ray A/S. These prices are in Danish kroner, and are the prices at which the equipment is sold to Picker-Andrex agents outside of the United States.

I trust that this information will give you everything you need for the file. Since this is proprietary information, I trust you will use it accordingly.

Addressing himself to these letters at the trial the witness Seibyl testified that at the time he wrote exhibit A he had not verified the information with Picker-Andrex and assumed, from a confused reply he received from Picker-Andrex, that appellant indeed received a special price. Since writing this letter he has learned, based upon a communication received from Picker-Andrex as well as from exhibit 1, that it is not true that Picker U.S. receives a special intra-company price from Andrex. And, as to exhibit B, he testified that since writing this letter and furnishing the price list it contained which was sent to him from Copenhagen he has learned from exhibit 1 that a 20 per cent discount is given to the dealer off this price list.

The witness Seibyl also testified on the subject of Picker-Andrex' warranty on its products. He testified (R. 57–58):

Q. Would you describe to the court the situation which exists with reference to these models which have been mentioned insofar as quantities [sic] are concerned?—A. Yes. Normally, Picker-Andrex X-Ray gives us a 12-month warranty on these products. We in turn in the United States have a repair depot and an after-sales service center. So that we import them, test them, and give the warranty to the customer. We are responsible for all warranty repairs and also all repairs out of warranty.

The witness went on to state that in the case of Picker-Andrex' other wholesalers or distributors they return their units to Copenhagen for repair.

The Government did not call any witnesses, but did introduce exhibits A and B into evidence during its cross-examination of the witness Seibyl.

Before the trial court appellant contended that the imported merchandise was freely sold to all purchasers for exportation to the United States within the meaning of 19 U.S.C.A., section 1401a(f), adding that the prices of such purchasers "clearly reflects the market value of the imported merchandise." (Plaintiff's brief, p. 22.) The trial court in considering the testimony of the witnesses Langston and Seibyl found that the evidence failed to establish the manner in which sales (at the claimed prices) were made in accordance with statutory export value requirements. The court said (p. 283) "The affidavit states that all sales were made at the prices set forth in the

price lists but it does not state that the X-ray equipment was freely sold or offered for sale to all purchasers at wholesale at those prices."

The trial court also dealt with the subject of "selected purchaser," finding that there was "no creditable proof that sales for export to the United States were restricted to selected purchasers."

In its fourth assignment of error before us appellant states:

4. The Court was in error in determining that the merchandise was not freely sold or, in absence thereof, that it was sold to a selected purchaser.

With respect to the first phase of the fourth assignment of error concerning all purchasers at wholesale appellant argues (brief pp. 8–9):

Andrex is not required to seek out and sell to all potential buyers. All that is necessary is that all *bona fide* purchasers of the usual wholesale quantities in the ordinary course of trade have an opportunity to buy under equal terms and conditions. [Citations omitted.] This is the situation which has been established by the evidence in this case. . . .

Appellee responds (brief, p. 12):

. . . [T]he record made herein is devoid of any proof of either actual sales or offers of sales to any purchaser in the United States other than appellants.

We agree with the trial court's determination that appellant failed to prove that the merchandise in issue was freely sold or offered for sale to all purchasers at wholesale at the claimed prices for exportation to the United States. There was no proof of sales or offers of sales for export to the United States to anyone other than appellant.

With respect to the latter phase of the fourth assignment of error concerning selected purchasers the trial court did not find that the merchandise was sold to a selected purchaser, as this assignment of error avers. On the contrary, the trial court concluded that there was no evidence of sales to a selected purchaser, as indeed, the position of appellant in this court readily admits. In its brief appellant argues (brief, p. 12):

Picker has proven that the imported merchandise was sold, or in the absence of sales, offered in the ordinary course of trade to one or more selected purchasers at wholesale. The proofs in this case clearly establish that the prices fairly reflect market value. . . .

Appellee's response was that appellant failed to establish that it was designated by the manufacturer as a selected purchaser or that the manufacturer would have refused to sell to others for exportation to the United States. Further, appellee argued that even assuming appellant to be a selected purchaser it failed to establish that the claimed

prices fairly reflect the market value of the merchandise measured against higher foreign home market prices.

This case was decided by the trial judge and the appeal argued before us prior to the decision of the Court of Customs and Patent Appeals in the case of *J. L. Wood v. United States*, 62 CCPA 25, C.A.D. 1139, 505 F. 2d 1400 (1974), which clearly defined what is required to establish proof of export value under the selected purchaser formula. In that case, involving engine heaters and car warmers exported from Canada and appraised on the basis of export value predicated on higher foreign market prices, our appeals court reviewed the legislative history of the Customs Simplification Act of 1956 and rejected this method of appraisement, stating in 505 F. 2d at p. 1405:

> . . . Although the term "market value" in section 402(f)(1)(B) was not defined in the Act, it obviously must relate to the relevant market. In the case of export value, this would be the export market in the exporting country to the United States and *not the foreign domestic market*, since use of the latter would result in a determination of foreign value, which was deleted by the Act.
>
> From the foregoing, we conclude that Congress clearly intended that export value be determined by considering only the exporting country's market for exportation to the United States and that sales at wholesale to exclusive or selected agents be used in determining export value if the prices fairly reflect the market value.[4] . . .

The holding in *Wood* closes the door on appellee's ultimate argument for sustaining the trial court's determination, predicated as it is upon an asserted lack of evidence of comparative foreign home market sales.

However, the decision of the trial court on the selected purchaser question is not inconsistent with the holding in *Wood* inasmuch as the decision below turned on the preliminary finding that appellant was not an exclusive or selected agent.

But, even assuming that appellant is a selected purchaser under the evidence presented in this record, the disputed prices do not fairly reflect the market value of the merchandise. There is evidence in the record that the disputed prices are special intra-company prices. And, although the witness Seibyl testified that he now believes that these prices are not special prices, his prior usage of this description in dealing with the customs service was predicated upon information passed on to him by the manufacturer.

Moreover, other circumstances in the record substantiate the existence of a special price arrangement between Picker U.S. and Picker-Andrex, namely, the warranty situation. It is established in the evidence that contrary to its ordinary practice the manufacturer

---

[4] See: Hearings on H.R. 6040 Before the House Comm. on Ways and Means, 84th Cong., 1st Sess. 120 (1955); Hearings on H.R. 6040 Before the Senate Comm. on Finance, 84th Cong., 1st Sess. 148 (1955); 3 U.S. Code Cong. and Adm. News 4180–4181 (1956).

does not perform the warranty service on the X-ray equipment it sells to appellant. Appellant performs the warranty service on this equipment both within and beyond the warranty period, in consequence of which it maintains a service department and an inventory of repair parts. Under this state of facts we cannot agree that the manufacturer's prices to appellant for this merchandise are normal, competitive market prices when they clearly do not reflect all elements, such as warranty service, which ordinarily must enter into its pricing structure. It follows, therefore, that the customs service was correct, in our view, in treating Picker U.S.' prices as not fairly reflecting the market value of the imported merchandise, and resorting to constructed value in appraising the merchandise.

The Court of Customs and Patent Appeals in *J. L. Wood* also pointed out that export prices to third country markets could not be used in determining export value to the United States, as this possibility was discussed and rejected at the time the Customs Simplification Act of 1956 was being considered and enacted. Also the language of the statute expressly limits consideration to the price "for exportation to the United States." 19 U.S.C.A., section 1401a(b).

We, therefore, find as facts:

1. The merchandise involved herein consists of X-ray equipment and parts, exported by Picker-Andrex X-Ray A/S of Copenhagen, Denmark, in the years 1968 through 1970.

2. The merchandise was appraised on the basis of constructed value as defined in 19 U.S.C.A., section 1401a(d) (section 402(d), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956).

3. Appellant failed to prove that the invoice unit prices herein are the prices at which, at the time of exportation, such or similar merchandise was sold or, in the absence of sales, offered for sale, to either all purchasers at wholesale, or in the ordinary course of trade, to one or more selected purchasers at wholesale, at prices which fairly reflected the market value of the merchandise, in the ordinary course of trade, for exportation to the United States.

And, on these facts, we conclude as matters of law:

1. Constructed value, as defined in section 1401a(d) is the proper basis for the determination of the value of the merchandise involved herein.

2. The correct dutiable values of such merchandise are the appraised values.

The decision and judgment of the trial court is affirmed, and judgment will be entered accordingly.